### AFFIDAVIT OF DEA TASK FORCE OFFICER DAVID KERR

I, David Kerr, being duly sworn, hereby depose and say:

### INTRODUCTION

1.      I am a Detective with the Mansfield Police Department Detective Division and
am currently sworn in as a Task Force Officer with the Drug Enforcement Administration (DEA)
Tactical Diversion Squad in Worcester, Massachusetts.  I have been a police officer for over 10
years with the Mansfield Police Department and have had various assignments which include but
are not limited to Patrol, Court Prosecutor and most recently the Detective Division. I am also
assigned to the Northern Bristol County Drug Task Force (NBCDTF), which consists of narcotic
investigators from agencies throughout Bristol County.  I graduated from the 54th ROC
Plymouth Police Academy where I received training in drug laws, enforcement and detection. I
have completed multiple Illegal Narcotics Law Enforcement Training programs and courses
offered by local, state and federal law enforcement, including training regarding drugs of abuse,
marijuana cultivation, undercover operations, informants, operational planning, recognition of
clan labs, motor vehicle hides, and criminal interdiction.  Prior to my employment with
Mansfield Police, I was a Military Police Officer with the U.S. Army for 8 years and was
assigned to the US Marshals Fugitive Task Force in Boston as well as the Counter Narcotics Unit
with the Massachusetts National Guard.

2.      I have a vast knowledge of drug possession and distribution activities through my
extensive training and experience with the U.S. Army, Mansfield Police, the NBCDTF and the
DEA. I have participated in writing and serving numerous search warrants. I have assisted with
hundreds of drug investigations and or arrests. These investigations and arrests utilized
techniques such as PC Arrests during street surveillance, purchases by confidential informants,

1

utilizing undercover Officers/Agents including myself, buy-bust operations and execution of

search warrants.  During my training and experience I have observed numerous types of

controlled substances and are familiar with the paraphernalia associated with the distribution and

use of these substances, the ways in which they are commonly packaged, the prices charged for

them, and the jargon/street terminology associated with their sale and use. Throughout my time

in law enforcement I have testified in multiple federal and state courts.

## PURPOSE OF AFFIDAVIT

3.      I make this affidavit in support of applications for three (3) warrants authorizing

law enforcement officers to search the following real properties:

    (a)      the premises located at **5 Ivanhoe Road, Worcester, Massachusetts**, and
the garage located on the property, as described in more detail in
<u>Attachment A-1;</u>

    (b)      the premises located at **29 Arrowsic Street, Worcester, Massachusetts**,
as described in more detail in <u>Attachment A-2</u>; and

    (c)      the premises located at **39 Merrifield Street, Apartment 3, Worcester,
Massachusetts**, described in more detail in <u>Attachment A-3</u>,



    (d)      a **gray 2006 Ford Fusion bearing Massachusetts registration 1RCP84
and Vehicle Identification Number (VIN) 3FAHP08176R123188** (the
"Subject Ford Fusion"), described in more detail in <u>Attachment A-4</u>; and

    (e)

4.      Based on the facts detailed below, there is probable cause to believe that Nestiano

KRISTO a/k/a "Nesti" (born 2001), Wallace MAINA (born 2002), Anas EDDZOUZI (born

2001), and others both known and unknown have committed violations of 21 U.S.C. § 841(a) (distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances) (collectively, the "Subject Offenses").

5.     As described below, there is also probable cause to believe that: (a) the Subject Properties and ▮▮▮▮▮▮ have been used, are being used, and will continue to be used to facilitate the commission of the Subject Offenses, and (b) the Subject Properties and ▮▮▮▮ ▮▮▮▮ contain evidence of crimes; contraband, fruits of crime, or other items illegally possessed; and constitutes property designed for use, intended for use, or used in committing the Subject Offenses.  A more specific list of items to be seized may be found in <u>Attachment B</u>.

6.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit includes only those facts necessary to establish probable cause for the issuance of the requested warrant and does not include all of the facts uncovered during the investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

### A.     Overview of Investigation

7.     Massachusetts State Police ("MSP"), DEA, and Worcester Police are presently investigating a nationwide drug trafficking organization that is apparently supervised by KRISTO.  The investigation has revealed that KRISTO and his associates utilize "Snapchat" to promote and facilitate the sale of cocaine, MDMA (a/k/a "Ecstasy"), methamphetamine, suspected fentanyl, marijuana, and other tetrahydrocannabinol ("THC") products.

8.     As detailed below, KRISTO not only meets customers himself but also supplies and employs numerous runners and distributors.  To date, an undercover officer (the "UC") has

purchased counterfeit Adderall (methamphetamine), counterfeit Xanax,[1] counterfeit oxycodone (suspected fentanyl), and cocaine from KRISTO and three separate runners/distributors, including MAINA, EDDZOUZI, and Quentin CHEW (born 2003).

9.      Investigators have served Snapchat with two separate state search warrants requesting information from numerous accounts utilized by KRISTO.  The records produced by Snapchat to date reveal that KRISTO supplies numerous individuals with large amounts of drugs.  KRISTO has promoted the Snapchat pages of CHEW and MAINA in the past and more recently informed his customers to visit CHEW's Snapchat page and to add the page as backup in case KRISTO's Snapchat account gets deleted.

10.      In a separate investigation, investigators identified Justin Kinney (born 2000) as a dealer of counterfeit Xanax (etizolam) and counterfeit Adderall (methamphetamine).  The UC purchased a total of approximately 2,000 counterfeit Xanax and Adderall pills from Kinney.

11.      On April 12, 2021, officers arrested Kinney and executed a state search warrant at his Worcester residence.  Investigators seized, amongst other things, over 5,000 grams of counterfeit Adderall pills (methamphetamine), over 4,000 grams of counterfeit Xanax pills (etizolam), approximately 80 grams of cocaine, approximately 60 grams of counterfeit oxycodone pills (fentanyl), and over $71,000 in cash.

12.      Investigators subsequently executed a state warrant to search Kinney's mobile phone.  That search revealed that Kinney was "friends" with the user of the Snapchat account

---

[1] Alprazolam is the generic name for Xanax.  Investigators believe the counterfeit Xanax pills being sold by KRISTO may actually contain etizolam, a theinodiazepine derivative that is not authorized for medical use in the United States but has not yet been scheduled as a controlled substance by DEA.

"abbottworld," an account known to be used by KRISTO.  A chat between Kinney and KRISTO revealed that Kinney had purchased at least 10,000 counterfeit Adderall pills from KRISTO.[2]

**B.     General Information Regarding the Snapchat Application**

13.     Snapchat is a global multimedia messaging application (commonly referred to as an "app"), primarily used for creating multimedia messages referred to as "snaps."  Snaps can consist of a photograph or a short video and can be edited to include filters and effects, text captions, and drawings. Snaps can be directed privately to selected contacts, or to a semi-public "Story" or a public "Story" called "Our Story."  To use Snapchat, a user must create a profile and a username.  This profile is generally associated with a cellular telephone, which is utilized to access one's Snapchat account to generate "postings."

14.     One of the core features of Snapchat is that any picture or video or message that is sent - by default - is made available to the receiver for only a short time before it becomes inaccessible.  This feature is particularly attractive to those engaged in the illegal distribution of narcotics because it allows them to reach a large audience base at one time with minimal (individual verbal or written) communication and by using photos, videos, and video-recorded messages.  Further, these messages are available only for a short period of time before they are deleted.  Finally, Snapchat provides an additional layer of protection from law enforcement because Snapchat accounts are password encrypted and can be controlled remotely from separate locations.  This allows the user to destroy potential evidence that could be used against them.

15.     There are two other features of Snapchat that are significant to this investigation:

     (a)     First, Snapchat includes a feature which alerts the sender of a message or post if a person receiving the message or post has recorded the image.  As a result, the UC and other investigators cannot simply "screenshot" KRISTO's Snapchat posts, as

---

[2] Audio messages were attached to the chat by "abbottworld" in which the user referred to himself "Nesti" i.e. KRISTO's nickname.  The UC also confirmed the voice to be that of KRISTO.

such an investigative step would alert KRISTO and his associates of the investigation. Accordingly, the UC and other investigators have endeavored to record/preserve the relevant Snapchat posts by KRISTO and his associates by using separate devices (i.e. using one phone to photograph the screen of another phone).

       (b)      Second, investigators are confident that the videos and images posted on Snapchat described below are authentic, posted in real time, and are being taken utilizing the Snapchat application on a mobile device based on the appearance of the videos and images. Specifically, if a video or image uploaded to a Snapchat account originated from another source – such as a previously taken photo that was saved on a person's phone or downloaded from the internet – the video or image will display the phrase "from camera roll." The majority of the images/videos described below have not included this disclaimer/stamp. To the extent any image/video described below contained that notation, I have indicated as such. Moreover, investigators still believe the images are authentic (but not posted in real time) based on the totality of the investigation.

## C.    Specific Information regarding KRISTO, 5 Ivanhoe Road and the Subject Ford Fusion

16.    Investigators performed a query of KRISTO through the Massachusetts Registry of Motor Vehicles (RMV) database. KRISTO's reported address is 5 Ivanhoe Road, Worcester. A review of KRISTO's Board of Probation (BOP) record revealed that KRISTO has open charges out of Worcester District Court for assault with a dangerous weapon and unlawful possession of ammunition. The BOP also listed his address as 5 Ivanhoe Road, Worcester.

### *KRISTO's May 5, 2021 Sale*

17.    On May 5, 2021, the UC initiated contact with KRISTO via KRISTO's Snapchat account "abbottworld" and inquired about the price for 1,000 Adderall pills. After several chats, KRISTO informed the UC that he would sell the pills for $1,700 and instructed the UC to meet him on Abbott Street in Worcester.

18.    The UC arrived and parked in the area of 6 Abbott Street. At approximately 4:05 pm, KRISTO[3] arrived in the Subject Ford Fusion that was driven by a male later identified as the

---

[3] The UC recognized KRISTO from images that KRISTO had previously posted on social media, as well as physical surveillance of KRISTO that the UC had previously conducted.

registered owner, EDDZOUZI.  KRISTO entered the UC's vehicle and displayed a plastic bag that contained a large amount of round counterfeit Adderall pills.  KRISTO emphasized how glossy the pills were, indicative of a high-quality counterfeit pill.  The UC inquired about the availability of counterfeit Xanax pills.  KRISTO informed the UC that 1,000 pills would cost $1,000.  KRISTO informed the UC that he also had cocaine and "Molly" for sale.  The UC provided KRISTO with $1,700 for the counterfeit Adderall pills.  KRISTO exited the UC vehicle, entered a dark colored BMW, then left the area.  The buy was recorded.

19.     The UC conducted a field-test of one of the pills and obtained a positive result for the presence of methamphetamine.  The pills weighed a total of approximately 330 grams.

### May 10, 2021 Distribution of Methamphetamine

20.     On May 10, 2021, the UC contacted KRISTO via Snapchat (Username "riskpays617"/Screen Name "Big nesti").  KRISTO agreed to sell 1,000 counterfeit Adderall pills for $1,700.  KRISTO instructed the UC to meet him on Abbott Street that evening.

21.     The UC drove to and parked in the area of 6 Abbott Street.  At approximately 7:45 pm, an agent[4] surveilling 5 Ivanhoe Road observed the Subject Ford Fusion exit the driveway of the residence.[5]  At approximately 7:52 pm, KRISTO arrived at Abbott Street as a passenger in the Subject Ford Fusion.

22.     KRISTO entered the UC's vehicle and handed the UC a plastic bag that contained round counterfeit Adderall pills and a plastic bag that contained white compressed powder, consistent in appearance with cocaine.  The UC provided KRISTO with $1,700.

---

[4] Unless otherwise indicated, the term "agent" refers generally to the DEA agents, DEA task force officers, Massachusetts State Troopers, and local police investigators involved in this investigation.

[5] The driveway for 5 Ivanhoe Road runs behind the neighboring property and is accessed from Saint Elmo Road, which runs perpendicular to Ivanhoe Road.

23.     KRISTO stated that the white substance was "this girl," which the UC understood to mean cocaine.  The UC spoke to KRISTO about the availability of "M Boxes," a common slang for oxycodone 30 mg pills manufactured by Mallinckrodt Pharmaceuticals.  The UC understood KRISTO was referring to counterfeit oxycodone pills.  KRISTO advised the UC that he (KRISTO) could sell the pills for $8/pill and that his "fiends," i.e. drug customers, loved them because they were "of such good quality you can smoke them."  The buy was recorded.

24.     After the purchase, the UC field-tested one of the pills and obtained a positive result for methamphetamine.  The UC field-tested the white powder and obtained a positive result for cocaine.  The pills weighed approximately 355 grams.

25.     On May 11, 2021, the UC reviewed a posting from KRISTO's Snapchat account "riskspay617".  The posting included a video – likely taken shortly after 9 am – that depicted a tan handgun with a black magazine in what appears to be KRISTO's bedroom (based on the UC's viewing of numerous images and videos posted by KRISTO throughout the investigation).

### May 13, 2021 Distribution of Cocaine and Suspected Fentanyl

26.     On May 12, 2021, the UC contacted KRISTO on Snapchat account "riskpays617" to order 200 counterfeit oxycodone (suspected fentanyl) pills at $7 per pill and one ounce of cocaine for $1,350.  KRISTO asked for the UC's phone number.  KRISTO later called the UC from telephone number 617-851-5946 and told the UC to call him in the morning.

27.     On May 13, 2021, at approximately 10:16 am, the UC called KRISTO to arrange the counterfeit oxycodone and cocaine sale.  KRISTO subsequently instructed the UC to meet him on Abbott Street.

28.     At approximately 10:30 am, TFO Gary Morris observed KRISTO exit 5 Ivanhoe Road and drive from the residence in a gray Subaru Legacy.[6]  KRISTO drove directly to the area of 37 Abbott Street.[7]

29.     At approximately 10:36 am, the UC arrived at Abbott Street.  KRISTO entered the UC vehicle and handed the UC a knotted sandwich bag containing a compressed white powder consistent with cocaine.  KRISTO also handed the UC two knotted baggies containing blue pills marked "M30" that appeared to be counterfeit oxycodone pills.  The UC provided $2,750 to KRISTO.  The UC then drove KRISTO through a parking lot and dropped him off near 22 Abbott Street.  KRISTO returned to the Subaru and left the area.  The buy was recorded.

30.     KRISTO returned directly to 5 Ivanhoe Road, parked behind the building and entered the residence through the rear door of the home.

31.     Agents field-tested the suspected cocaine and received a positive reaction for cocaine.  The suspected fentanyl pills and the cocaine were secured pending further analysis.[8]

### May 18, 2021 Distribution of Methamphetamine

32.     On May 18, 2021, at approximately 12:25 pm, surveillance at 5 Ivanhoe Road observed a gray Pontiac sedan (registered to a business rather than an individual) arrive at and park behind 5 Ivanhoe Road.  At approximately 12:32 pm, the single male operator left alone.  In my training and experience, that activity is consistent with a drug transaction.

---

[6]  The Subaru Legacy is registered to Romeo Ngjela, 769 Main Street, in Worcester.  This is the residence of Aleksandra Ngjela, who is believed to be KRISTO's girlfriend.

[7]  Before leaving 5 Ivanhoe Road, KRISTO posted an image of thousands of pills on Snapchat, including hundreds of what appeared to be the same counterfeit oxycodone pills that he later sold to the UC.

[8]  Investigators did not field-test the counterfeit oxycodone purchased in this investigation based on safety concerns involved with breaking the pills and handling suspected fentanyl.

33.     That same day, the UC spoke with KRISTO by telephone.  KRISTO agreed to sell

2,000 counterfeit Adderall pills for $3,400.  KRISTO informed the UC that he had to go to

Pittsfield first and that he would be prepared to meet the UC in 3-4 hours.

34.     The UC later communicated with KRISTO and arranged to meet KRISTO again

on Abbott Street.  The UC arrived at Abbot Street at approximately 6:52 pm.

35.     Surveillance was established at KRISTO's residence at 5 Ivanhoe Road.  At

approximately 7:21 pm, the Subject Ford Fusion arrived and parked behind the residence.  An

agent observed KRISTO in the backyard of the residence.  KRISTO then entered 5 Ivanhoe Road

through the rear door.  Approximately one minute later, KRISTO exited the residence with a

backpack and entered the front passenger seat of the Subject Ford Fusion.

36.     Surveillance followed the Subject Ford Fusion directly to Abbott Street.  At

approximately 7:30 pm, EDDZOUZI[9] parked the Subject Ford Fusion on Abbott Street and

exited the vehicle carrying a green bag while KRISTO remained in the car.  EDDZOUZI entered

the UC vehicle and introduced himself as "Anas."  EDDZOUZI handed the green bag – that

contained two Ziploc bags filled with approximately 2,000 orange counterfeit Adderall pills – to

the UC.  The UC provided $3,400 to EDDZOUZI, as well as a pack of Newport cigarettes.[10]

EDDZOUZI exited the UC vehicle and re-entered the Subject Ford Fusion.

---

[9] The UC, as well as DEA task force officers Travis Gould and Jamie Vitale, recognized EDDZOUZI
from prior surveillance.  The UC subsequently viewed an RMV photo of EDDZOUZI and confirmed that
he was the male who delivered the pills on May 18, 2021.

[10] KRISTO had previously asked the UC to pick up Newport cigarettes for him because KRISTO could
no longer purchase menthol cigarettes within Massachusetts.

37.     Surveillance followed the Subject Ford Fusion to a gas station on Park Avenue where EDDZOUZI refueled the vehicle.  EDDZOUZI then drove directly to 5 Ivanhoe Road. KRISTO exited the car and entered the residence.

38.     The pills that EDDZOUZI distributed to the UC weighed approximately 715 grams.  The UC field-tested one of the pills and obtained a positive result for methamphetamine.

### KRISTO's Travel to California

39.     On May 20, 2021, investigators learned that KRISTO was scheduled to fly from Logan Airport to Los Angeles.  At approximately 5:20 pm, MSP Trooper Jessica Gonzalez responded to a JetBlue checkpoint upon report of a large amount of cash located in KRISTO's carry-on bag.  KRISTO told Trooper Gonzalez that he had an apartment in Beverly Hills for which he pays rent in cash.  KRISTO stated that the approximately $15,000 in the bag was from his uncle's car dealership in Worcester, where he is paid in cash.  MSP took no further steps with respect to the cash so as to not jeopardize this investigation.

40.     That same day, at approximately 7 pm, the UC contacted KRISTO on his Snapchat account "riskpays617" and asked KRISTO if he was going to be back or if he had someone the UC could see while he was away.  KRISTO replied, "Nah runner fully active," and instructed the UC to contact him and KRISTO would get the UC whatever he needed.

41.     On May 21, 2021, the UC posted an image of a Smith and Wesson .38 revolver on his undercover Snapchat page.  At approximately 2:16 pm, KRISTO contacted the UC on Snapchat (account username "madpacsmass" / screen name "JohnSmith") and wrote "If u can bring these specifically I'll pay a 800-1k depending on how many.  We snub atm".  From that request, it appears that KRISTO is actively looking to purchase snub-nosed revolvers.  The UC stated that he would get back to him, and KRISTO replied "Word he'll [sic] yeah".  Over the

11

course of the weekend, KRISTO used Snapchat to make numerous posts (some included below) that depicted large amounts of drugs, currency, a money counter, and posts suggesting he uses the mail to ship drugs.



42.    On May 25, 2021, the UC observed "stories" that KRISTO posted on Snapchat. KRISTO referenced being "bagged" by TSA.  At approximately 2:10 pm, the UC observed a message posted on KRISTO's "riskpays617" account indicating that he was stuck on the west coast until he got everything situated but that everything was still "on da flow."[11]

### May 25, 2021 Distribution of Methamphetamine

43.    On May 25, 2021, the UC contacted KRISTO using Snapchat and arranged to purchase 1,000 counterfeit Adderall pills.

44.    Later that day, the user of the Snapchat account informed the UC that he was traveling from Boston to meet the UC.  The UC was asked for his phone number, which

---

[11] Investigators obtained the report of KRISTO's arrest at Los Angeles International Airport.  TSA found KRISTO in possession of approximately 25 grams of concentrated cannabis and approximately 80 grams of suspected marijuana when KRISTO was attempted to pass through the TSA checkpoint.  KRISTO was detained for a relatively short period of time, then released.

suggested to the UC that one of KRISTO's associates was logged into the account.[12]  At

approximately 6:12 pm, the UC received a call from telephone number 774-701-2342.  The

caller confirmed that he was "Nesti's boy."  The UC advised that he needed 1,000 counterfeit

Adderall pills; the caller stated that he was just getting into Worcester and was going to pick

them up.  The two men agreed to meet on Abbott Street.

45.    The UC later drove to the area of 22 Abbott Street.  At approximately 6:44 pm, a

silver Nissan Altima arrived.  EDDZOUZI exited the Altima and walked to the UC vehicle.  The

Altima drove away.

46.    EDDZOUZI entered the UC vehicle and provided a plastic bag containing

approximately 1,000 counterfeit Adderall pills to the UC.  The UC provided $1,700 to

EDDZOUZI.  The UC asked EDDZOUZI if he had called previously from 774-701-2342, which

he confirmed. EDDZOUZI asked the UC for a cigarette and then exited the UC vehicle.

47.    Agents followed EDDZOUZI as he walked to a church parking lot on Pleasant

Street and watched as EDDZOUZI drove the Subject Ford Fusion from the lot.  Agents

attempted to follow but terminated those efforts after EDDZOUZI engaged in several counter-

surveillance tactics.

48.    The pills distributed by EDDZOUZI weighed approximately 320 grams.  The UC

field-tested one of the pills and obtained a positive result for methamphetamine.

### Post May 25, 2021 Activity

49.    KRISTO returned to Massachusetts the following weekend.  The UC monitored

KRISTO's Snapchat accounts (Usernames/Screen names "madpacsmass"/"John Smith" and

---

[12] Based on prior contacts and ping warrants previously issued for KRISTO's cellphones (21-mj-4212-DHH and 21-mj-4213-DHH), agents knew that KRISTO was currently located in Los Angeles and already had the UC's phone number.

"riskpays617"/"Big Nesti") and observed numerous images of large quantities of cash, pills, marijuana, and suspected cocaine. Specifically, based upon the location information gathered from KRISTO's phones, it appears that KRISTO photographed a full kilogram of suspected cocaine from inside 5 Ivanhoe Road:[13]

      

Currency           Counterfeit Xanax          MDMA

---

[13] Verizon Wireless is the service provider for both of KRISTO's cellphones for which investigators obtained court-authorized location information. The location information provided by Verizon is not exact and precision of such data can vary. There were numerous instances when KRISTO was confirmed by physical surveillance to be present at 5 Ivanhoe Street, yet the Verizon location records frequently placed KRISTO's phones in the area of Abbot Street and Pleasant Street. Verizon records reflect the margin of error regarding the location data for the phones during those periods as approximately 1,058 meters. The estimated distance between 5 Ivanhoe Street and the area of Abbot/Pleasant Streets is approximately 1,189 meters (per Google Earth), slightly outside the 1,058-meter range indicated in the Verizon records. It is unclear to investigators the reason for this discrepancy. Significantly, in this affidavit when it is indicated that "phone location information suggests KRISTO was in the area of 5 Ivanhoe Road," that is intended to mean that the Verizon location information for KRISTO's phones reflected the area of Abbott/Chandler Street, in other words, the location that Verizon Wireless data frequently placed the phones when agents physically confirmed KRISTO's presence at 5 Ivanhoe Road.

14

   

Currency        Suspected Cocaine        Currency        Directing to CHEW's page

48.     On June 1, 2021, at approximately 12 pm, agents conducting surveillance at 5 Ivanhoe Road observed a female believed to be KRISTO's girlfriend, Aleksandra Ngjela, exit the residence and leave in the gray Subaru Legacy.

49.     At approximately 2 pm, the Subject Ford Fusion arrived and parked at 5 Ivanhoe Road.  While the vehicle was parked, KRISTO posted images of marijuana and pills for sale. KRISTO then exited the rear door of 5 Ivanhoe Road carrying a plastic shopping bag and entered the Subject Ford Fusion.  Agents followed as the Fusion traveled to the area of Courtland and Geneva Streets where a male, identified as Tramaine McNeill, entered the car.  The men drove for approximately 1-2 minutes, turned around, and McNeill was dropped off.  As he exited the Subject Ford Fusion, McNeill held a bag that appeared to be the same plastic bag that KRISTO carried from 5 Ivanhoe Road.  McNeill then got in a different Ford Fusion (bearing Massachusetts registration 2JJC87) and left the area.  In my training and experience, the activity involving McNeill was consistent with a drug transaction.

50.     KRISTO and EDDZOUZI traveled in the Subject Ford Fusion to Abbott Street. McNeill's vehicle was also observed on Abbott Street.  A short time later, KRISTO and

15

EDDZOUZI drove back to 5 Ivanhoe Road.  KRISTO exited the Subject Ford Fusion and

entered the residence through the rear door.  Soon after, KRISTO exited the residence carrying

two large plastic shopping bags that contained large bulky items and re-entered the Subject Ford

Fusion.

51.     Agents followed the Subject Ford Fusion to Abbott Street where agents observed

an interaction though the driver's side window with an unidentified male on foot.  After that

occurred, agents were unable to follow the Fusion; however, a short time later it returned to 5

Ivanhoe Road and KRISTO entered the residence through the rear door.

52.     EDDZOUZI left in the Subject Ford Fusion and traveled to the area of Thorne

Street.  Surveillance was unable to follow.  Approximately 30 minutes later, EDDZOUZI

returned to 5 Ivanhoe Road in the Fusion.

### June 2, 2021 Sale of Methamphetamine

53.     On June 2, 2021, at approximately 12:53 pm, the UC contacted KRISTO on his

Snapchat account "riskpays617."  KRISTO agreed to sell the UC 1,000 counterfeit Adderall pills

(referred to as "circles") on Abbott Street.

54.     At approximately 1:45 pm, agents observed a black Nissan Murano bearing

Connecticut registration arrive at 5 Ivanhoe Road and park in the driveway.[14]  Several minutes

later, the Murano left 5 Ivanhoe Road with KRISTO as a passenger and traveled to the area of 22

Abbott Street.

55.     KRISTO exited the Murano and entered the UC's vehicle.  KRISTO handed the

UC a Ziploc bag that contained approximately 1,000 counterfeit Adderall pills (suspected

---

[14]  The Murano was registered to Yimmy Brito-Brito (born 1969).  RMV records revealed that Brito-Brito
had a listed address of 8 Cottage Street, Apartment 1, Worcester.  An RMV query revealed that Jimmy
Brito (born 1994) also resides there.

methamphetamine) in exchange for $1,500.[15]   KRISTO then exited the UC's car and left the area

in the Murano.  The buy was recorded.  The suspected methamphetamine pills weighed

approximately 375 grams.

56.   Following the sale, agents monitored the locations of KRISTO's mobile phones.

The location data for his phones suggests that KRISTO traveled to the Lee/Pittsfield area and

then returned home to the area of 5 Ivanhoe Road (see footnote 13).  At approximately 10:06 pm,

agents conducting surveillance observed the Murano arrive and KRISTO exit the vehicle and

enter the residence.  After arriving home, KRISTO posted an image (shown below) of a large

amount of cash:



**D.   Specific Information regarding MAINA, 29 Arrowsic Street** ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇

59.   An RMV query for MAINA revealed a listed address of 29 Arrowsic Street,

Worcester.  A BOP query revealed MAINA has open charges out of Worcester District Court for

firearms violations (Docket #2162CR000349A).  MAINA is currently under court-ordered home

confinement requiring him to be in the residence from 8 pm until 7 am the next morning.

---

[15]  KRISTO gave the UC a $200 discount because the UC had to wait for him.

60.     On May 26, 2021, at approximately 12:05 am, the UC replied to an image of firearms that MAINA posted on his Snapchat account with Username "wokhardt2021" and Screen name "Wok Hardt".  Specifically, the UC asked MAINA if the guns were "9's," i.e. 9 millimeters.  Shortly after 8 am, MAINA replied "yes."  The UC asked for a price to buy both guns.  MAINA wrote that he was planning a "lick" but he had seen the UC on some of his snaps so he was "being real" with UC.  MAINA then offered to sell the "Baby 26" for "23," i.e. $2,300.[16]

61.     The UC replied that he could not pay $2,300 because the UC would not be able to make a profit from the re-sale of the guns.  MAINA then asked where the UC was from and what was on the UC's "menu."  A "menu" commonly refers to the menu of drugs one offers for sale.  MAINA stated he was looking for a "plug" (drug source) who can beat the prices he was paying.

*June 1, 2021 Apparent Drug Activity*

62.     On June 1, 2021, surveillance was established at 29 Arrowsic Street.  At approximately 10:43 am, MAINA posted counterfeit oxycodone pills for sale from his Snapchat "Memories."[17]

63.     At approximately 11:20 am, ██████████████████████████████████████

██████████████████     MAINA, carrying a black bag around his shoulder, exited 29 Arrowsic Street through the garage ████████████████████████████████████████

███████████████████████████████████████████████████

---

[16] Based on my training and experience and conversations with other agents, a "lick" refers to a robbery; therefore, it appears that MAINA did not intend to sell the firearms but, instead, planned on robbing a potential buyer.  Moreover, $2,300 is an unreasonable price for the "Baby 26" (i.e. Glock 26).  This again indicates that MAINA never intended to sell the firearms.

[17] "Memories" are a feature of Snapchat that stores previously posted data.

Investigators are familiar with Canavan, are aware that he is a close associate of MAINA, and have previously received information regarding Canavan being engaged in drug activity.

64.     Agents followed ███████████████ to 16 Blossom Street, Worcester. MAINA and Canavan exited the vehicle and were met at the front door by an unknown male. The three men then entered the building.

65.     Approximately an hour later, the three males exited 16 Blossom Street ████████ ████████████████████████████ to the residence of Quentin CHEW at 145 Beaconsfield Road.  A male exited 145 Beaconsfield Road ████████████████ ███████████████ ████████████[18]  Within 2-3 minutes, the male ████████████████ ████████████████████ re-entered 145 Beaconsfield Road.  ████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ██████████

66.     Surveillance followed the Subject Subaru Impreza into Westborough where an unknown male got into the vehicle for a short period of time before separating.  In my training and experience, that conduct is consistent with a drug transaction.  Agents then followed the Impreza onto 495 North.  While MAINA was in the Subject Subaru Impreza, he posted images of marijuana, counterfeit oxycodone (blue pills), and counterfeit Xanax (yellow pills) on his Snapchat account.  The image of the counterfeit oxycodone and Xanax is included below:

---

[18] Although that sweatshirt prevented a positive identification, investigators believe the male was CHEW.



67.     That same evening, at approximately 7:30 pm, MSP Trooper Felipe Martinez establish surveillance at 29 Arrowsic Street. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████ MAINA ████████████████ entered the residence through the garage.  He carried what appeared to be the same black bag that investigators saw him leave with earlier that day before conducting the apparent drug transactions.

*Additional Evidence of Drug Activity Involving 29 Arrowsic Street* ████████████
████████████

68.     On June 2, 2021, surveillance was again established at 29 Arrowsic Street.  At approximately 8:50 am, MAINA posted images of marijuana for sale on his Snapchat account. At approximately 9:04 am, MAINA posted an image of a large amount of currency on the same account.  At approximately 11:45 am, ████████████████████████████████████ MAINA exited his residence carrying a black bag (consistent in appearance with the bag he possessed the previously day) a███████████████████████████████████ The above

supports the belief that MAINA is storing illegal drugs and proceeds from illegal drug sales at 29

Arrowsic Street, ███████████████████████████████████████████████ to

transport and distribute controlled substances.

69.     On June 7, 2021, MAINA posted an image on his Snapchat account (Username

"wokhardt2021"/Screen name "Wok Hardt") that displayed what appeared to be counterfeit

Adderall, counterfeit Xanax, counterfeit Oxycodone, MDMA pills, and a large amount of

marijuana.  The drugs were positioned on a bed with a distinctive floral-patterned sheet.

70.     On June 9, 2021, MAINA posted another image on the same Snapchat account

that displayed him sitting in a bed with the same floral sheets.

71.     On June 10, 2021, at approximately 3:51 am, MAINA posted another image on

the same Snapchat account that displayed a female lying in a bed with the same floral-patterned

sheets (a portion of MAINA's hand appears to be depicted near the female's head).  This image

was time-stamped, indicating it was posted approximately three hours prior, at approximately

12:51 am, which is within the time frame that MAINA is confined by court-order to 29 Arrowsic

Street.




[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

72. The images referenced in the preceding three paragraphs are shown below:

  

June 7, 2021 image     June 9, 2021 image     June 10, 2021 image

Based on the totality of the facts, including these images, investigators believe there is probable cause to believe that 29 Arrowsic Street ▮▮▮▮▮▮▮▮▮▮▮▮ contain evidence of crimes; contraband, fruits of crime, or other items illegally possessed; and constitutes property designed for use, intended for use, or used in committing the Subject Offenses

### E.    Specific Information regarding 39 Merrifield Street, Apartment 3 and the Subject Ford Fusion

73.    On or about June 3, 2021, investigators received the Snapchat records from KRISTO's "abbottworld" Snapchat account pursuant to state search warrant. Those records included an April 21, 2021 chat between KRISTO and the user of Snapchat account "adeangelo38" that related to apparent drug activity. Specifically, KRISTO stated that he had missed his flight and directed "adeangelo38" to park at 26 Elliot Street. The user of

"adeangelo38" asked which car would be used for the sale, to which KRISTO replied "naw u gonna come to my house," and that they will have time to "chop it up."[19]

74.     KRISTO then directed "adeangelo38" to 33 Merrifield Street[20] and said it is just around the corner from Elliot Street.  Later in the conversation, presumably after the men met, KRISTO told "adeangelo38" to "save the video so I can save it."  In response, "adeangelo38" sent a video to KRISTO that showed a brown crystal-like substance consistent with the appearance of MDMA in a bag on a table.  It then appears that the participants in the drug sale perform a field-test on the MDMA, presumably to establish the quality of the product.

75.     Additionally, around this same time, a chat video located in the Snapchat records showed a rolling suitcase with several pounds of marijuana in it.  I have observed this type of suitcase in numerous files that KRISTO previously posted on Snapchat.  In this particular video, the suitcase was positioned on a laminate kitchen floor with a unique pattern.  I have previously seen Snapchat and Instagram posts from KRISTO in which the laminate floor with this same pattern was present.  One Instagram image (included below) depicted KRISTO, whose face was fully visible, standing in a kitchen with this same patterned floor:

---

[19] In my training and experience, the term "chop it up" refers to breaking down bulk amounts of drugs to re-package for sale.

[20] Investigators traveled to Merrifield Street and observed there was no 33 Merrifield Street, i.e. the house numbers jump from 31, to 35, to 39.  In my training and experience, I know it is not uncommon for drug distributor to safeguard stash locations and avoid informing people of their exact locations.



76.    Another image posted on Snapchat (shown below) depicts an individual, presumably KRISTO, standing above a rolling suitcase that is filled with marijuana.  The suitcase is resting on what appears to be the same laminate kitchen floor:



77.     I have also observed videos taken in what appears to be the same kitchen of two people counting large amounts of currency.  In all of these images and videos, there is very little to no furniture visible indicating the location is a stash location for drugs and currency.

78.     On June 5, 2021, I observed images posted on KRISTO's Snapchat account (Username "riskpays617"/Screen name "Big Nesti") that showed several bottles of Promethazine Hydrocholoride and Codeine Phosphate oral solution in a refrigerator door.  This substance is frequently abused and sold to drug users as "drank."  KRISTO has previously referenced "drank" on numerous occasions.  In the images, the same unique pattern is visible on the floor in front of the refrigerator, indicating that it was taken at the same location referenced above in paragraphs 65 and 66:



Notably, the location information obtained from Verizon Wireless for KRISTO's cell phones at the approximate time that the image was posted suggests that the phones were actually in

the area of 39 Merrifield Street.[21]

69.     On June 7, 2021, at approximately 10:30 pm, the location information for

KRISTO's mobile phones suggested they were in the area of Merrifield Street (see footnote 21).

Tpr. Martinez traveled to 39 Merrifield Street and observed the Subject Ford Fusion parked in

front of 39 Merrifield Street.  The only lights on in the building were located on the third floor.

Tpr Martinez also observed the windows on the third floor were partially covered with

cardboard, limiting people's view into the residence.  At approximately 11:48 pm, the lights on

the third floor shut off.  An unknown white male exited the front door of 39 Merrifield Street,

followed by KRISTO and EDDZOUZI.  The unknown male entered a red Ford Edge bearing

Massachusetts registration 3EVE81 and drove away.

70.     An RMV query of the Ford Edge revealed that it was registered to Anthony

Deangelo (born 1991).  A BOP query of Deangelo revealed prior drug charges and a conviction

for armed robbery.  Deangelo is likely the user of the Snapchat account "adeangelo38".

71.     After Deangelo left the area of 39 Merrifield, KRISTO was picked up by the gray

Subaru Legacy that appears to be used by his girlfriend, Aleksandra Ngjela.  EDDZOUZI then

left in the Subject Ford Fusion.  After KRISTO arrived at 5 Ivanhoe Road, he posted images on

---

[21] There were several instances when KRISTO was confirmed by physical surveillance to be present at 39 Merrifield Street, yet the Verizon location records consistently placed KRISTO's phones in the area of a tire business at 73 Chandler Street (a location that KRISTO does not have any known connection with). Verizon records reflect the margin of error regarding the location data for the phones during those periods as approximately 872 meters.  The estimated distance between 73 Chandler Street and 39 Merrifield Street is approximately 1,800 meters, well outside the range indicated in the Verizon records.  It is unclear to investigators the reason for this discrepancy.  Significantly, in this affidavit when it is indicated that "phone location information suggests KRISTO was in the area of 39 Merrifield Street," that is intended to mean that the Verizon location information for KRISTO's phones reflected the area of 73 Chandler Street; in other words, the location that Verizon Wireless data frequently placed the phones when agents physically confirmed KRISTO's presence at 39 Merrifield Street.

Snapchat of a large amount of US currency.  Based on the UC's previous viewing of numerous images and videos posted by KRISTO (including images that depicted KRISTO's family members), the currency appeared to be sitting on the kitchen counter at 5 Ivanhoe Road.

### *EDDZOUZI's Residence at 39 Merrifield Street and Further Apparent Drug Activity*

72.     During the mornings of June 8 and June 9, 2021, investigators drove past 39 Merrifield Street and observed the Subject Ford Fusion parked in front of the residence, suggesting EDDZOUZI is living at the residence.

73.     During the early morning hours of June 10, 2021, investigators attached a GPS tracking device onto the Subject Ford Fusion.[22]  That GPS revealed that, later that day, EDDZOUZI traveled to the area of 5 Ivanhoe Road at approximately 11:13 am, then departed and stopped in the area of various residential locations in the Worcester area (including the Abbott Street area where the UC purchases have been conducted).  The Subject Ford Fusion returned to the area of 5 Ivanhoe Road at approximately 1:02 pm and remained there for approximately 11 minutes.  At approximately 1:24 pm, the Subject Ford Fusion arrived in the area of 39 Merrifield Street.

74.     Moreover, the location information for KRISTO's phones also suggest that at approximately 1:15 pm, KRISTO departed the area of 5 Ivanhoe Road (see footnote 13) and eventually traveled to 39 Merrifield Street (see footnote 21).  The GPS tracker revealed that Subject Ford Fusion then left Merrifield Street, while Kristo's phone location information suggested that he remained in the area of 39 Merrifield Street (see footnote 21).  The Fusion then traveled to the Taunton, Massachusetts area before returning to 39 Merrifield Street.

---

[22] The GPS tracker was authorized by the Court on June 1, 2021 (Docket No. 21-mj-1245-DLC)

75.     While EDDZOUZI was away from 39 Merrifield Street (and location information for KRISTO's phones suggested that he was still in the area of 39 Merrifield Street), several people traveled to 39 Merrifield Street and appeared to engage in drug activity.  Specifically, at 3:10 pm, Tpr. Martinez observed a black Infinity Q50 parked outside of 39 Merrifield Street.  He recognized this vehicle as being used by Zachary Crowley, a known drug distributor in the area. Investigators had recently received information that Crowley was selling a large variety of drugs and surveillance had been conducted where several apparent hand-to-hand exchanges were observed between Crowley and his customers.  Four minutes later, at approximately 3:14 pm, Crowley exited 39 Merrifield Street carrying a bulky plastic shopping bag.

76.     At approximately 4:13 pm, Tpr. Martinez observed a black Toyota Corolla arrive at 39 Merrifield Street.  A RMV query revealed the vehicle was registered to Ornela Belishta, 18 Suburban Rd, Worcester.  An RMV query of 18 Suburban Road revealed a Nicholas Belishta living at that address.  The male driver, consistent in appearance with Nicholas Belishta, exited the Corolla and entered 39 Merrifield.[23]  Belishta exited 39 Merrifield after a short period of time and drove from the area.

77.     At approximately 4:36 pm, EDDZOUZI returned to the area of 39 Merrifield Street in the Subject Ford Fusion.  At approximately 6:06 pm, a gray Toyota Highlander arrived at 39 Merrifield Street.  A male with dark hair exited the vehicle, retrieved a folded up, brown paper bag from the passenger side, and entered the residence.  Investigators suspect this bag likely contained currency to purchase drugs.  Surveillance was terminated prior to the male leaving.

---

[23] A social media query of Balishta revealed that he is Facebook friends with EDDZOUZI.  Balishta was previously charged with possession to distribute a class D substance, a charge that was later dismissed.

78.    On June 13, 2021, at approximately 6:38 am, I observed an image that KRISTO posted on Snapchat that showed a large amount of what appeared to be counterfeit oxycodone pills.  The image indicated that it was taken eleven hours prior, making the approximate date and time that the image was taken to be June 12, 2021 at 7:38 pm.  The location information obtained from KRISTO's mobile phone suggested that he was in the area of 39 Merrifield Street when the photo was taken (see footnote 23).  The relevant photo is provided below:



79.    Since investigators began monitoring the GPS tracker on or about June 10, 2021, the Subject Ford Fusion has been parked overnight in the area of 39 Merrifield Street almost every night.  This is further evidence that EDDZOUZI is residing at that location.

### Confirmation of Apartment 3

80.    On June 14, 2021, at approximately 6:15 am, surveillance established a position in the area of 39 Merrifield Street.  The Subject Ford Fusion was parked across the street from the residence, and a white Hyundai Sonata bearing Florida registration was parked in front of the home where the Subject Vehicle is usually parked.  KRISTO recently posted images and videos of himself operating a Hyundai and posted a snap asking who could get him a rental car.

81.     Later that day, at approximately 1 pm, surveillance was again established at 39 Merrifield Street.  The red Ford Edge registered to Deangelo was parked across the street from the residence.  After several minutes, the Ford Edge pulled away, circled the block, and departed again.  At approximately 1:23 pm, the white Hyundai Sonata returned and KRISTO and EDDZOUZI exited the vehicle.  KRISTO was observed to have a bulky backpack and a second bag in his hand.

82.     Deangelo returned in the Ford Edge and exited the vehicle.  He joined KRISTO and EDDZOUZI standing near the Subject Ford Fusion.  At one point, Deangelo returned to his vehicle as if he had forgotten something and then re-joined EDDZOUZI and KRISTO outside 39 Merrifield Street.  The three men then entered 39 Merrifield Street together.

83.     A short time later, EDDZOUZI exited 39 Merrifield Street and appeared to begin performing maintenance on the Subject Ford Fusion.  MSP Trooper Eric Higgins, in an undercover capacity, entered 39 Merrifield Street, took the stairs to the third floor, and knocked on the door to Apartment 3.  No one answered the door; however, EDDZOUZI re-entered 39 Merrifield Street and engaged in brief conversation with Tpr. Higgins on the third floor landing outside Apartment 3.  EDDZOUZI then entered the door to Apartment 3 and Tpr. Higgins left the building.

84.     Several minutes later, KRISTO, EDDZOUZI and Deangelo exited 39 Merrifield Street.  Deangelo carried a large, paper shopping bag that appeared to be full.  After several minutes, Deangelo entered his red Ford Edge and drove from the area.  KRISTO and EDDZOUZI then re-entered 39 Merrifield Street together.  Based on my training and experience, and the investigation to date, I believe the three men engaged in a drug transaction in 39

Merrifield Street, Apartment 3.  I have included three photos taken by surveillance that afternoon:

  

| KRISTO outside 39 Merrifield with backpack | Deangelo returning to car before entering 39 Merrifield with KRISTO and EDDZOUZI | KRISTO, EDDZOUZI and Deangelo outside Subject Ford Fusion (hood raised) |

### KNOWLEDGE OF DISTRIBUTION NETWORKS

85.     In my training and experience, I have also learned the following:

i.      Drug distribution is sometimes conducted as a cash and carry business, and at other times, drugs are bought and sold on credit.  In either event, the distribution of drugs is a cash business, and distributors of drugs often deal in large sums of money.  This necessitates that the distributor be in the possession of or has ready access to large amounts of money.

ii.     Because drugs are often bought and sold on credit, distributors frequently maintain written and/or electronic records of the drugs bought and sold, the identities of the persons who have purchased or sold the drugs, and the moneys due to, or owed, by them.  These records may be tangible or in electronic form.  In the case of electronic records, it is common for drug distributors to store these records on mobile electronic devices such as tablets, mobile phones, as well as on personal computers.

iii.    Distributors of drugs often maintain books, records, documents, electronic documents, receipts, invoices, notes, ledgers, money orders, bank records and other papers relating to their transportation, ordering, sale, and distribution of controlled substances.

31

iv. Persons involved in the distribution of controlled substances often secrete their distribution records, controlled substances, and money, on their person, in their residences, in the residences of persons involved with them in the distribution of controlled substances, in their places of business, in their vehicles, and in bank safe deposit boxes, safes, and other secure storage areas to which they have access.

v. Drug distributors may hide their monies, rather than investing in bank accounts or other investment vehicles.  Also, drug distributors often are familiar with the drug forfeiture laws, and attempt to conceal from law enforcement those assets, which are used to facilitate their drug distribution activities. As such, monies, as well as ownership records for other assets such as vehicles and real estate, are often secreted in secure storage areas such as safe deposit boxes.

vi. Persons involved in the distribution of controlled substances utilize various paraphernalia, such as scales, cutting agents (diluents) and packaging materials such as plastic sandwich baggies, to prepare and package these controlled substances for further  distribution.  Such paraphernalia are often stored in close proximity to where the controlled substances are stored, such as in the cars and residences of distributors, and on their persons.

vii. Persons involved in the distribution of illegal narcotics may secrete a portion or all of their narcotics, money, and distribution records in vehicles that are parked within close proximity of their residences.  This is done so that in the event their homes are searched by police evidence of their distribution is safely concealed in a separate location that is easily accessible to the distributor.

viii. Persons involved in the distribution of controlled substances often utilize "hides" in their vehicles, businesses, and homes.  These hides are built into different areas of the cars and are built in such a way that they blend in with the car's original interior or exterior.  These "hides" can be opened manually or electronically by manipulating several different electronic devices in the vehicle. Some are also opened with the use of magnets.  In the homes and businesses, the hides are built into the floors, walls, and furniture.

86.     Through my training and experience, I also know that drug distributors frequently utilize the assistance of other persons to aid them in the distribution of illegal drugs.  These individuals may be acting as partners of the distributor or may also be acting as delivery persons in an attempt by the distributor to insulate themselves and remain undetected by police.

Because of this fact it is impossible for me to know who will be present within the Subject Properties ████████████ when the search warrant is executed.   I know drug distributors often protect their valuable drugs/currency with weapons and use the assistance of others in doing so.  For these reasons, I am requesting authorization to search any and all persons who are present at Subject Properties and ████████████ when the requested warrants are executed.

### SEARCH OF CELLULAR TELEPHONES

87.     As described in <u>Attachment B</u>, I also seek authorization to seize and search any cell phone that is found within the Subject Properties and ████████████ and that appears to be used by KRISTO, MAINAS and/or EDDZOUZI.

88.     Based on my training and experience, I know that individuals involved in illegal narcotics distribution use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  Because cellular telephones are often a principal means of communication, individuals typically keep the phones in close proximity or at their residences.

89.     Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending,

receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

90.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities on their cellular telephones.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

91.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store

records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

92.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts

from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

93.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## APPLE TOUCH ID

94.     It is possible that the phones seized as part of this search warrant will be Apple iPhones.  I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

95.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents.

This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

96.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

97.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  Should agents find KRISTO, MAINAS and/or EDDZOUZI in possession of an Apple iPhone when the search is executed, I request that the Court authorize law enforcement to press that individual's fingers to that iPhone for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

**CONCLUSION**

WHEREFORE, based on the facts detailed above, there is also probable cause to believe that (a) the Subject Properties and ███████████ (as described in more detailed in Attachments A-1 through A-5) have been used, are being used, and will continue to be used to facilitate the commission of the Subject Offenses, and (b) the Subject Properties and ██████████ ██████████ evidence of crimes; contraband, fruits of crime, or other items illegally

possessed; and constitutes property designed for use, intended for use, or used in committing the

Subject Offenses, as specifically detailed in Attachment B, hereto.

Sworn to under the pains and penalties of perjury.

David Kerr
Special Agent
Drug Enforcement Administration

Sworn to via telephone in accordance with Federal Rule of
Criminal Procedure 4.1 on June 16, 2021:

Donald L. Cabell
United States Magistrate Judge